# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| TIMMY BOWMAN, ) | |
|  ) | |
| Plaintiff, ) | |
|  ) | |
| v.  ) | Case No. 1:19-cv-04483-TWP-DML |
|  ) | |
| WEXFORD OF INDIANA, LLC, and ) | |
| PAUL TALBOT, Dr., ) | |
|  ) | |
| Defendants. ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO GRANT INJUNCTION, AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment and several related motions, including a request for injunctive relief. Plaintiff Timmy Bowman ("Bowman") filed this civil rights action alleging that the Defendants Wexford of Indiana, LLC ("Wexford"), the prison's medical provider, and Paul Talbot ("Dr. Talbot") an individual prison doctor (collectively, the "Defendants"), were deliberately indifferent to his serious medical needs. Specifically, in his Complaint, Bowman alleges the Defendants have failed to treat him for his high blood pressure, brain aneurism, tumor, or blood clot in his head.[1] He also alleges that he suffers from other serious medical conditions and seeks injunctive relief to have coronary artery, carotid artery, or cauterization surgery, or any other surgery needed for his medical conditions. The Defendants and Bowman have sought summary judgment on these claims. For the following reasons, the Defendants' Motion for Summary Judgment (Dkt. 58) is **granted**, and Bowman's

---

[1] Bowman raises other medical conditions in his summary judgment filings, but these are the only conditions identified in the Complaint and the Screening Order, (Dkt. 9), and therefore the only conditions that are the subject of this case.

Motion for Summary Judgment, (Dkt. 54), and Motion Asking Court to Grant Plaintiff a Permanent Injunction, (Dkt. 62), are **denied**.

### I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Federal Rule of Civil Procedure 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896

(7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before it. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 572-73 (7th Cir. 2017).  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

The Court will recite the factual background for this case in accordance with the summary judgment standards.  That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to Bowman as the nonmoving party. *See Barbera v. Pearson Education, Inc.,* 906 F.3d 621, 628 (7th Cir. 2018).

## II.  FACTUAL BACKGROUND

Bowman's symptoms—including high blood pressure, fainting, dizziness, and vision loss—are cause for concern.  And Bowman is correct that his prison medical providers, including Dr. Talbot, did not identify the cause of these symptoms or find a successful treatment.  But the record shows that it was not for lack of trying.  Dr. Talbot closely monitored Bowman's symptoms, changed his medications multiple times based on hypotheses about the causes, ordered tests when the medication changes did not resolve the issues, referred him to an optometrist, and referred him

to an outside neurologist. And other medical professionals at the prison joined the effort. But there is no evidence that anyone—even the outside specialists—has identified a root cause of Bowman's symptoms or an effective way to treat them.

### A. The Parties

During the relevant times, Dr. Talbot worked for Wexford as a physician at Pendleton Correctional Facility ("Pendleton"). (Filing No. 60-2 ¶ 2.) Bowman is an inmate at Pendleton. (Dkt. 60-3 at 5.) He arrived there with several chronic conditions, including COPD, heart disease, high blood pressure, and borderline-diabetes. *Id.* at 13-14. He also has a history of heart catherization and stents. (Dkt. 55-1 at 1.) Wexford contracted to provide medical care to Indiana Department of Correction inmates during the relevant times.

### B. Bowman's Medical Care

#### 1. Initial Treatment with Dr. Talbot

When Bowman arrived in the Indiana Department of Correction in June 2018, he had prescriptions for several medications, including Coumadin, which is meant to reduce the formation of blood clots, and therefore reduce the risk of stroke, heart attack, or other serious conditions. (Dkt. 60-2 ¶ 4, 6; Dkt. 60-1 at 24-28, 92-93, 95-101, 122.) Bowman reportedly began taking Coumadin in 2006 when a blood clot was diagnosed near his right pelvic vein. (Dkt. 60-1 at 24.) When the clot recurred, Coumadin was continued indefinitely. *Id.*

In August 2018, when Bowman was transferred to Pendleton, Dr. Talbot ordered that Bowman's International Normalized Ratio ("INR") be checked once per week. (Dkt. 60-2 ¶ 5; Dkt. 60-1 at 102.) The INR measures the effects of blood thinners like Coumadin on the clotting system. (Dkt. 60-2 ¶ 5.) An INR of 1.1 or below is normal. *Id.* When the INR is higher than the recommended range, it could mean that that person's blood clots too slowly. *Id.*

On September 6, 2018, Dr. Talbot met with Bowman for a chronic care visit, where they addressed his hypertension, high blood pressure, obesity, asthma, and diabetes. (Dkt. 60-2 ¶ 7; Dkt. 60-1 at 104-10.) Dr. Talbot ordered a low-bunk and low-tier pass for Bowman through September 6, 2019. *Id.* Dr. Talbot also ordered that Bowman decrease his Coumadin by 15% and continue with INR checks once a week. *Id.* Dr. Talbot noted that Bowman's hypertension was controlled. *Id.*

Bowman's INR ranged from 1.4 to 3.6 throughout the rest of 2018. (Dkt. 60-2, ¶ 8; Dkt. 60-1 at 112-18, 120.) In January 2019, Dr. Talbot ordered a slight increase in Bowman's Coumadin. (Dkt. 60-2 ¶ 9; Dkt 60-1 at 121.)

Dr. Talbot met with Bowman again on February 14, 2019, for a chronic care appointment. (Dkt. 60-2, ¶ 10; Dkt. 60-1 at 24-28.) Dr. Talbot ordered that Bowman continue with the medication and the weekly INR tests. *Id.* Bowman's blood pressure that day was 107/83, and Dr. Talbot noted that Bowman's hypertension was controlled. (Dkt. 60-1 at 26.)

Throughout February and March 2019, Bowman's Coumadin was adjusted based on the INR readings. (Dkt. 60-2, ¶ 11; Dkt. 60-2 at 30-31; 32-34.)

**2.     Bowman's Coumadin Prescription**

The parties dispute whether Bowman was compliant with his Coumadin in the summer of 2019. Dr. Talbot ordered Bowman to be monitored closely based on the results of the INR checks several times in May 2019. (Dkt. 60-2 ¶ 14; Dkt. 60-1 at 36 (INR checks once per week); 37 ("monitor closely and continue weekly inrs")); Bowman was also counseled on the importance of complying with his prescriptions. (Dkt. 60-2, ¶ 14; Dkt. 60-1 at 36-39.) Bowman states that he did not miss doses of Coumadin. (Dkt. 79 at 23 ¶ 122.)

5

The Defendants assert that Bowman met with a nurse on June 18, 2019, and reported that he had "missed a couple of doses" of Coumadin. (Dkt. 60-2, ¶ 16; Dkt. 60-1 at 43-45.) Bowman was again counseled on the risks associated with missing medication, including blood clots and an increased risk of death. *Id.* The medication administration record showed six missed doses out of the first seventeen days in June. (Dkt. 60-2, ¶ 16; Dkt. 60-1 at 43.)

On June 20, 2019, Dr. Talbot saw Bowman. (Dkt. 60-2, ¶ 17; Dkt. 60-1 at 46-48.) Bowman's INRs were outside the normal range. *Id.* Bowman's blood pressure that day was 128/88. (Dkt. 60-1 at 47.) On June 25, 2019, Dr. Talbot continued the order for weekly INR accu-checks. (Dkt. 60-2, ¶ 18; Dkt. 60-1 at 49-50.)

### 3. Complaints of Dizziness, Lightheadedness, and Fainting

On June 26, 2019, Bowman met with Family Nurse Practitioner Elaine Purdue ("FNP Purdue") reporting that he was dizzy and light-headed. (Dkt. 60-2, ¶ 19; Dkt. 60-1 at 53-56.) Bowman told her that this happened when he was standing and denied that anything provided him with relief. *Id.* He further explained that he was experiencing chest pain and headaches, and was having trouble walking to chow because he would become short of breath . *Id.* FNP Purdue ordered a medical lay-in with meals for Bowman for one month, a chest x-ray, and an EKG. (Dkt. 60-1 at 51-55.)[2] Bowman's blood pressure was taken four times with the following results: 112/78, 120/88, 120/78, and 130/72. (Dkt. 60-1 at 54.)

On July 11, 2019, Bowman was seen by a nurse for his reports of severe headaches, dizziness, and fainting episodes several times per day. (Dkt. 60-2 ¶ 20; Dkt. 60-1 at 57-58.) His blood pressure was 122/96. (Dkt. 60-1 at 58.)

---

[2] Bowman asserts that FNP Purdue recommended he see a specialist at this time, but he points to no evidence to support this.

The next day, a nurse met with Bowman for an INR check. (Dkt. 60-2 ¶ 21; Dkt. 60-1 at 60-61.) The nurse updated Bowman's medical records to reflect that he was on a medical lay-in so his medication, including Coumadin, was to be delivered to him. *Id.*

Dr. Talbot met with Bowman a few days later. (Dkt. 60-2, ¶ 23; Dkt. 60-1 at 62-65.) Again, the parties dispute whether Bowman was non-compliant with his medications. But Dr. Talbot did not see any reason for Bowman to remain on a medical lay-in and ordered that Bowman could use wheelchair assistance, if necessary, to go to med-line to receive his medication. *Id.* Dr. Talbot also ordered a baseline EKG and ensured that Bowman received his Coumadin dose at this appointment. *Id.* Bowman's blood pressure that day was 106/70. (Dkt. 60-1 at 63.)

On August 8, 2019, Dr. Talbot met with Bowman after he complained that he had passed out several times, which he reported occurred when he was walking or even sometimes when he was sitting on his bed. (Dkt. 60-2, ¶ 24; Dkt. 60-1 at 67-71.) While Dr. Talbot did not observe any sign of fainting as Bowman reported, he thought that Bowman's symptoms were consistent with autonomic nervous system disorder beginning two months earlier. *Id.* Dr. Talbot also observed that Bowman's anxiety was significant, he had an exaggerated physiological tremor, flushing of the skin, and was tachycardic.[3] *Id.* Dr. Talbot suspected that Bowman was having a negative reaction to his Zoloft prescription. *Id.* He spoke to Bowman's psychiatrist the next day, and the psychiatrist agreed to discontinue Zoloft for a short time to allow Dr. Talbot to reassess the situation. (Dkt. 60-2 ¶ 25.)

On August 13, 2019, Bowman met with FNP Purdue for a follow-up visit, where Bowman reported he was having a hard time catching his breath even during short walks. (Dkt. 60-2, ¶ 26;

---

[3] "Tachycardia is the medical term for a heart rate over 100 beats per minute." *Tachycardia*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127#:~:text=Tachycardia%20is%20the%20medical%20term,to%20have%20a%20fast%20heartbeat (last visited Sep. 17, 2021).

7

Dkt. 60-1 at 73-75.) FNP Purdue explained that his Zoloft had been discontinued so that providers could assess whether Bowman had serotonin syndrome.[4] *Id.* at 74.

Dr. Talbot saw Bowman the next day, after he had been off the Zoloft for a few days. Dkt. 60-2, ¶ 27; Dkt. 55-1 at 156-58. Dr. Talbot observed Bowman to be less anxious, no longer flushed, and with no exaggerated tremor. *Id.* Dr. Talbot concluded that Bowman likely suffered from serotonin syndrome. *Id.* His blood pressure that day was 110/80. (Dkt. 55-1 at 157.)

On August 28, 2019, Dr. Talbot and Bowman discussed Bowman's chronic dizziness and inability to walk long distances due to a fear of falling. (Dkt. 60-2, ¶ 28; Dkt. 60-1 at 77-82.) There was no record that Bowman had fallen, but Dr. Talbot believed a trial of the prescription Meclizine could help treat the dizziness. *Id.* Dr. Talbot ordered Bowman to be on medical idle for 30 days but also ordered that he attend chow and med-line by wheelchair. *Id.* His blood pressure that day was 123/82. *Id.*, Dkt. 55-1 at 167.

On September 6, 2019, Dr. Talbot ordered an increase in Bowman's Coumadin and ordered that INR checks be completed twice per week for two weeks and then once per week after that. (Dkt. 60-2 ¶ 29; Dkt. 60-1 at 83.) Bowman saw an on-site optometrist who believed that he had Amaurosis Fugax, which was affecting the vision in both eyes at the same time and could indicate an issue with Bowman's brain. *Id.* ¶ 30.[5] He reported:

> **Exam Data/Objective Findings:** This Ofd. Case baffles me and likely will need expertise of a neurologist. He claims persisting dizziness, vertigo, and inability to ambulate without falling though NO documentaiton [sic] or witness of the falls.

---

[4] "Serotonin syndrome occurs when a person takes medications that cause high levels of serotonin in the body." Mayo Clinic, *Serotonin Syndrome*, https://www.mayoclinic.org/diseases-conditions/serotonin-syndrome/symptoms-causes/syc-20354758 (last visited Sept. 17, 2021). Symptoms include agitation, confusion, rapid heart rate and high blood pressure, dilated pupils, loss of muscle coordination, muscle rigidity, headache, and shivering, among others. *Id.*

[5] Dr. Talbot states that during a chronic care visit on September 11, 2019, Bowman walked out of the appointment against medical advice. (Dkt. 60-2 ¶ 31; Dkt. 60-2 at 88-90.) Again, Bowman denies ever walking out of a chronic care appointment. (Dkt. 56 ¶ 62.)

> On-site optometrist seems to feel there is amaurosis fugax here despite a normal non-focal neuro exam and vascular exam by me. Per on-site optometrist:
>
> "Thank you for referring Mr. Bowman. He is an interest case presenting with intermittent vision loss. After some research my impression is:
>
> Amaurosis Fugax. This condition is typically divided into several causes … embolic, hemodynamic, ocular, neurologic, and idiopathic.
>
> It is interesting both eyes fail together and vision returns to both eyes together. Possibly it may be of value to consider perfusion to brain.
>
> After my exam I do believe the eyes themselves are in good condition.
>
> Regards,
> Steven Hill, OD"

(Dkt. 60-1 at 85) (emphasis in original). On September 9, 2019, Dr. Talbot requested a neurology consult based on Bowman's reports of dizziness, vertigo, and difficulty walking without falling. (Dkt. 60-2 ¶ 30.)

On September 16, 2019, Bowman reported being light-headed and dizzy and having difficulty breathing. (Dkt. 60-2 ¶ 32; Dkt. 60-2 at 1-3, 91.) FNP Purdue ordered Bowman to be placed in the HRU,[6] where his vitals could then be measured every four hours and he would be monitored frequently. *Id.* She also ordered a chest x-ray, an EKG, and an echocardiogram to capture when Bowman was symptomatic. *Id.* His blood pressure that day was measured four times: 142/98, 146/100, 170/100, 140/100. (Dkt. 60-1 at 2.)

On September 18, 2019, Dr. Talbot noted that no one had witnessed him fall even though Bowman continued to report falling. (Dkt. 60-2, ¶ 33; Dkt. 60-1 at 5-7.) Bowman's latest EKG

---

[6] The parties do not define the term HRU, but the Court understands this term to refer to a healthcare unit. In the medical dorm, Bowman has routine access to the medical staff. (Dkt. 60-3 at 34, 64-65.) While the nurses and other members of the medical staff are not in the dorm all day, they walk by and look in quite frequently. *Id.* Additionally, right outside of Bowman's unit is the "CO [correction officer] bubble", where members of the custody staff sit and watch the offenders all day. *Id.* Unfortunately, Bowman is presently in a wheelchair. (Dkt. 76 ¶ 33.)

was normal, and his labs were normal. *Id.* Because there was no clinical evidence of either fainting or near fainting, Dr. Talbot did not order any new treatment for Bowman at this appointment. *Id*

FNP Purdue evaluated Bowman on September 20, 2019, where he reported that he was still experiencing dizziness and had muscle cramps in his legs. (Dkt. 60-2, ¶ 34; Dkt. 60-1 at 13-15.) Bowman's cardiac and pulmonary examinations were normal. *Id.* Bowman was provided a bottom-bunk pass through September 16, 2020, and a medical lay-in with meals and medication through October 21, 2019. (Dkt. 60-2, ¶ 34; Dkt. 60-1 at 8.) FNP Purdue requested an MRI because of his continued reports of dizziness. (Dkt. 60-2 ¶ 34; Dkt. 60-1 at 9-11.)

On September 24, 2019, Bowman's prescription for Coumadin was increased, and Dr. Talbot ordered twice-weekly accu-checks. (Dkt. 60-2 ¶ 35; Dkt. 60-1 at 16.)

Bowman had an MRI on October 11, 2019. (Dkt. 60-2 ¶ 37; Dkt. 60-1 at 20-21.) The results of the MRI were as follows:

> IMPRESSION:
>
> - Two dimensional echocardiogram, spectral and color flow doppler imaging performed
> - Normal left ventricular systolic function with left ventricular ejection fraction 50-55%
> - No wall motion abnormality seen
> - Valves appear structurally normal
> - Concentric left ventricular hypertrophy
> - Cardiac chamber sizes are normal and size
> - Mild pulmonary insufficiency

(Dkt. 55-1 at 363).

On October 17, 2019, FNP Purdue ordered a medical lay-in for both meals and medications through February 2020. (Dkt. 60-2 ¶ 38; Dkt. 60-1 at 23.) Bowman's blood pressure was 140/98 that day and Dr. Talbot increased his prescription for the blood-pressure medicine Lisinopril. (Dkt. 55-1 at 210.)

Dr. Talbot left his position at Pendleton in November 2019.[7] (Dkt. 60-2 ¶ 39.)

### 4. Treatment after Dr. Talbot Left Pendleton

On November 29, 2019, FNP Purdue was called to the infirmary because Bowman's like heart was racing and he was suffering from migraines. (Dkt. 55-1 at 218.) He was given metoprolol, which is used to treat chest pain and hypertension. *Id.*

On January 14, 2020, Bowman was taken to see an outside neurologist, who referred him to a cardiologist. (Dkt. 55-1 at 378.) A month later, on February 7, 2020, Bowman saw an outside cardiologist[8] who noted the following:

> Assessment & Plan:
>
> The patient is incarcerated of her [sic] life it appears. He has had difficult-to-control hypertension. The prison has a nurse who [has] been checking his blood pressure. However[,] he is on maximal medical therapy for the hypertension including amlodipine 10 mg daily and Catapres 0.1 mg twice daily and Lasix 40 mg daily and Prinivil 20 mg daily and metoprolol tartrate 100 mg twice daily and potassium 20 mEq daily. He is a diabetic on metformin. He has statin therapy which is Crestor. He is 51 years old. He had DVT. He is on lifelong anticoagulation [his] INR is checked regularly at the prison and was recently 1.6. He has a lot of complaints. He has had syncopal spells with on further clarification seems to be vasodepressor syncopal spells. He has heart pounding despite the pretty high dose of the beta-blocker. His blood pressure[']s been running high. He has palpitations when he lays in bed sometimes. He is a never smoker. His cardiac exam is normal. His EKG is normal. Echocardiogram is revealed some left ventricular hypertrophy with normal LV function. There was some question of pulmonary insufficiency which is a[n] incidental finding. Very difficult social situation. Really little else to add for his hypertension. Because of the syncope I have ordered a 2 week event monitor and some blood work and a chest x-ray because he gets short of breath quite easily with exertion.
>
> Preetham Jetty, MD

(Dkt. 55-1 at 381-82.) There is no record of any further recommendation by the cardiologist.

---

[7] Bowman asserts that Dr. Talbot was replaced because of the poor care he was providing, but he provides no foundation to support this conclusion.

[8] Bowman asserts that the cardiologist made a number of statements to him about his treatment, but these are inadmissible hearsay. *See* Fed. R. Evid. 801.

11

Nearly six months later, on June 1, 2020, Bowman was taken to the hospital because of blackouts, fainting, blindness, and hypertension.[9] (Dkt. 56 ¶ 64, Dkt. 55-1 at 386.) He was diagnosed with drug-induced hypotension. (Dkt. 55-1 at 387.) The doctor at the hospital cancelled some of his medications and ordered other medications. (Dkt. 56 ¶ 73; Dkt. 55-1 p. 427.) In August of 2020, Bowman wrote to Dr. Knieser at Pendleton asking if he would be seeing a cardiologist or having carotid artery surgery. (Dkt. 55-1 at 481.) In response, he was told that the severity of his plaques in his arteries did not yet warrant surgery. (Dkt. 55-1 at 481.) He was told that it should be treated with medication, diet, and exercise. *Id.* at 483.

### 5. **Treatment in 2021**

Bowman saw Dr. Knieser in March of 2021, and Dr. Knieser assessed him with tachycardia.[10] (Dkt. 86-1 at 2.) Dr. Knieser saw him again on April 5, 2021 for complaints of chest pain and tachycardia. *Id.* at 4-6. Dr. Knieser noted that Bowman's medications would be changed and he would be observed taking them. *Id.* Dr. Knieser saw him again approximately two weeks later and noted: "suspect AF will follow EKGs, cardiology follow up in future." *Id.* at 7-9. Dr. Knieser also increased Bowman's metoprolol prescription, noting that the tachycardia was better controlled on a higher dose. *Id.* at 7.[11]

### III. **DISCUSSION**

As an initial matter, the Court will address the ancillary motions pending in this case. Bowman's arguments within his briefing that he was denied discovery is not appropriate in a summary judgment motion. The Order Setting Pretrial Schedule and Discussing Discovery in

---

[9] Bowman contends that nurses at Anderson Hospital told him delays in treatment had caused him to suffer strokes and blood clots, among other things. (Dkt. 56 ¶ 68.) This too is inadmissible.

[10] Bowman also asserts that Dr. Knieser diagnosed a hiatal hernia, but that condition is not at issue in this case.

[11] Bowman asserts that Dr. Knieser has requested a referral to a cardiologist, and that he could have a stroke, but such requests have been denied pending a ruling in this case. (Dkt. 85 ¶ 16.) This, too, is inadmissible hearsay.

Prisoner Litigation, (Dkt. 30), explained what steps he should take if he believed he had not received adequate discovery responses. Thereafter, Mr. Bowman filed a motion for sanctions pointing out that he has been receiving copies recent medical records from the medical department and not from the defendants in discovery. The Court denied the motion for sanctions finding no sanctionable conduct. (Dkt. 104). Two days ago—on September 20, 2021—Mr. Bowman filed a Motion Asking the Court to Open Discovery Ordering Defendants to Supplement Discovery with and/and all Doctor Referrals to see a Specialist and the Responses from the Decision Maker. That Motion, (Dkt. 103), is **denied**. The summary judgment motions have been fully briefed for some time. Further, any medical care that he received after November 2019 is not relevant to Bowman's claims against Dr. Talbot, who left PCF in November of 2019. And, as explained below, Bowman's care, standing alone, is not enough to support a policy claim against Wexford and therefore is also irrelevant to this summary judgment ruling. Several other motions—Bowman's motion to replace declaration, (Dkt. 64), motions to supplement his motion for summary judgment, (Dkt. 65 and Dkt. 85), motion to strike response in opposition to the motion for summary judgment, (Dkt. 82)—are before the Court, and will be resolved in this Order.

The Court will address Bowman's claims against Dr. Talbot, and then turn to the claims against Wexford.

**A.**   **Dr. Talbot**

Bowman and Dr. Talbot seek summary judgment on Bowman's claims. Dr. Talbot agrees for purposes of summary judgment that Bowman's conditions are objectively serious medical needs. He argues, however, that he was not deliberately indifferent to his need for treatment.

To prevail on his Eighth Amendment deliberate indifference claim, Bowman must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2)

13

Dr. Talbot knew about his condition and the substantial risk of harm it posed, but disregarded that risk. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, \*2 (7th Cir. 2015). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

Dr. Talbot saw Bowman several times from late 2018 to early 2019. Dr. Talbot ordered regular INR checks to monitor his risk of blood clots and adjusted Bowman's Coumadin based on the results. (Dkt. 60-1 at 30-31, 36-39, 102, 104-10, 112-18, 120-12136-39.) Bowman's blood pressure readings were stable during that time and Dr. Talbot noted that his hypertension was under control. (*See* Dkt. 60-1 at 104-10.) The parties dispute whether Bowman was compliant with his Coumadin prescription during this time, but there is no evidence to support a conclusion that Dr. Talbot was withholding medication from Bowman or modifying his prescriptions for any

14

reason other than Bowman's presentation and INR results. Thus, whether Bowman was compliant with his Coumadin is not material to whether Dr. Talbot provided him adequate treatment. Bowman's blood pressure remained normal during early 2019, and Dr. Talbot noted that his hypertension was controlled. (Dkt. 60-1 at 24-26.)

Bowman began complaining of dizziness and light-headedness in late June of 2019. (Dkt. 60-2 ¶ 19; Dkt. 60-1 at 53-56.) He saw FNP Purdue and a nurse for these complaints and then saw Dr. Talbot on June 26, 2019. (Dkt. 60-1 at 53.) Dr. Talbot believed that Bowman's fainting might be a reaction to his Zoloft prescription and asked Bowman's mental health provider to discontinue it to test that theory. (Dkt. 60-2 ¶ 25.) After Bowman had been off of Zoloft for several days, Dr. Talbot concluded that he likely suffered from serotonin syndrome. (Dkt. 60-2 ¶ 27.) But when Bowman continued to complain of dizziness and fainting, Dr. Talbot tried medication to treat the dizziness. (Dkt. 60-2 ¶ 29; Dkt. 60-1 at 77-82.) When that did not resolve Bowman's complaints, he saw FNP Purdue, who ordered an EKG, an echocardiogram, and a chest x-ray. (Dkt. 60-2 ¶ 32; Dkt. 60-2 at 1-3, 91.) Because Bowman's tests were normal, Dr. Talbot did not order further treatment. (Dkt. 60-2 ¶ 33; Dkt. 60-1 at 5-7.)

Bowman had an MRI on October 11, 2019. (Dkt. 60-2 ¶ 37; Dkt. 60-1 at 20-21.) After the results of the MRI were received, Bowman was referred to an offsite neurologist, which ultimately led to an offsite cardiology visit. (Dkt. 60-1 at 22.) Dr. Talbot left Pendleton in November of 2019. (Dkt. 60-2 ¶ 39.)

While Bowman argues that Dr. Talbot continued with ineffective treatment and told him "there is nothing wrong" with him, (Dkt. 56 ¶ 24), the record reflects that Bowman's condition was stable throughout late 2018 and early 2019. When Bowman began to complain of lightheadedness and dizziness, Dr. Talbot ordered testing, adjusted his medications, and referred him to specialists.

Rather than persisting in a course of treatment that was not working, it is undisputed that Dr. Talbot considered Bowman's complaints and test results and tried different courses of action and tests to treat him. Bowman has not presented evidence from which a reasonable jury could find that Dr. Talbot did not exercise his medical judgment while treating Bowman. Dr. Talbot is therefore entitled to summary judgment on Bowman's claims.

### B.    Wexford

Next, Bowman claims that his alleged mistreatment resulted from a policy, practice, or custom by Wexford. Wexford acted under color of state law by providing medical care to state prisoners, so it is treated as a government entity for purposes of Section 1983 claims. *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). Thus, Wexford "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by [its] employees. [It] can, however, be held liable for unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005-06 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978)).

The Seventh Circuit has identified several ways in which a plaintiff might show that an entity like Wexford maintained a policy, practice, or custom that resulted in a constitutional violation.

> First, [he] might show that the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Second, [he] might prove that the constitutional deprivation was visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels. Third, the plaintiff might be able to show that a government's policy or custom is made ... by those whose edicts or acts may fairly be said to represent official policy. As we put the point in one case, a person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government.... Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice.

*Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) (cleaned up).

Bowman has identified no express policy statement or custom by Wexford that resulted in any injury to him. He asserts that his mistreatment was the result of "widespread bad practices" of Wexford, (*see* Dkt. 56 ¶ 84-85), but he does not identify any alleged poor medical treatment other than his own. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782 at 796 (7th Cir. 2014) ("isolated incidents do not add up to a pattern of bad behavior that would support an inference of a custom or policy"). He further argues that Wexford's failures to refer him to a "Complex Case Management Clinic," to properly train its doctors, and to follow recommendations caused him injury. He also contends that Wexford maintains a bad practice of delegating care to doctors rather than overseeing them.

Establishing *Monell* liability based on inaction is difficult "because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and resulting injury is more tenuous." *J.K.J. v. Polk County*, 960 F.3d 367, 378 (7th Cir. 2020). "[A] failure to act amounts to municipal action … only if the [defendant] has notice that its program will cause constitutional violations." *Id.* at 379. This "requires a 'known or obvious' risk that constitutional violations will occur." *Id.* Evidence of a known or obvious risk can come from proof of a pattern of similar constitutional violations. *Id.* at 380. Here, it is undisputed that Bowman was seen regularly by medical providers who evaluated his condition, ordered testing, and recommended outside consultation. Bowman has not presented any evidence that Wexford policymakers were aware that any alleged failure to train, failure to supervise, or failure to enroll him in a Complex Case Management Clinic would result in the violation of his rights.

Bowman further argues that he was denied care by Michael Mitcheff, a Wexford administrator who denied requests for outside consultation. But Bowman presents no evidence that would allow a reasonable jury to find that Dr. Mitcheff was a final decision-maker,[12] so this argument does not help Bowman's claim survive summary judgment.

Because there is no evidence to support a conclusion that any alleged deliberate indifference was the result of a policy, practice, or custom on Wexford's part, or an action by a final decision-maker, Wexford is entitled to summary judgment.[13]

### IV. CONCLUSION

For the foregoing reasons, Bowman's Motion for Summary Judgment, Dkt. [54], is **DENIED**, and the Defendants' Motion for Summary Judgment, Dkt. [58], is **GRANTED**. Bowman's Motion Asking Court to Grant Permanent Injunction, Dkt. [62], is **DENIED** because he has not shown a right to relief on the merits of his claims. *See Chathas v. Local 134 IBEW*, 233 F.3d 508, 513 (7th Cir. 2000) (an injunction requires success on the merits of the claims).

Bowman's Motion to Replace Declaration, Dkt. [64], is **GRANTED.** His Motions to Supplement his Motion for Summary Judgment, Dkt. [65], and Dkt. [85], are **GRANTED** to the extent that the supplements were considered. Bowman's belated Motion Asking the Court to Open Discovery Ordering Defendants to Supplement Discovery with any/and all Doctor Referrals to see a Specialist and the Responses from the Decision Maker, Dkt. [103] is **DENIED**. The Defendants'

---

[12] Bowman cites generally to his medical records and request for interview forms to support the proposition that Dr. Mitcheff is a final decision-maker, but the request for interview forms do not indicate that Dr. Mitcheff is a final decision-maker and, as previously discussed, the Court is not required to scour every inch of that 200-page exhibit to find evidence to support this conclusion.

[13] Nothing in this Order is meant to suggest that Bowman's providers have "done all they could" and are now free to stop searching for answers or more effective treatments. The duty to provide constitutionally adequate medical treatment is ongoing.

Motion to Strike Plaintiff's Second Response Opposing Defendant's Motion for Summary Judgment, Dkt. [82], is **DENIED**.

    Judgment consistent with this Order shall now issue.

    **SO ORDERED.**

Date: 9/22/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Timmy Bowman, #251961
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com